# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| JOSHUA MOSES, *Prison Identification No. 55716-066*,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>TIMOTHY STEWART, *Warden,*<br>S. MOHAMED MOUBAREK, *Clinical Director,*<br>MARIA ARVIZA, *Associate Warden,*<br>STEPHANY MCGANN, *Physician,*<br>JAMIE HAMILTON-RUMER, *Health Services Administrator,*<br>ALLISON FOOTE, *Assistant Health Services Administrator,*<br>TODD, *Duty Nurse,*<br>HALL, *Duty Nurse,*<br>VARIMETER, *Duty Nurse,*<br>BOCH, *Duty Nurse,*<br>SWICK, *Duty Nurse,*<br>CONNOR, *Unit Manager,*<br>FAZENBAKER, *Case Manager,*<br>M. MUIR, *Correctional Counselor,* and<br>HERSHENBERGER, *Psychologist,*<br><br>　　　Defendants. | Civil Action No. TDC-15-3875 |

# MEMORANDUM OPINION

On December 18, 2015, Plaintiff Joshua Moses, currently confined at the Federal Correctional Institution in Cumberland, Maryland ("FCI Cumberland"), filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241. On December 28, 2015, he filed a Motion for a Temporary Restraining Order and a Preliminary Injunction. The substance of Moses's Petition and Motion, that prison staff have been deliberately indifferent to his serious medical condition,

prompted this Court to construe his petition for writ of *habeas corpus* as a civil rights action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging a violation of Moses's right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment. Based on Moses's allegations, the Court ordered Defendants to file a Response to the Motion. After Defendants filed their Response on February 2, 2016, Moses filed a Reply memorandum of law on February 16, 2016. Since filing the Petition and the Motion, Moses has filed five other motions to supplement the original petition and has filed two separate motions for appointment of counsel. The Court discusses all of these motions in turn.

## BACKGROUND

On August 9, 2009, Moses was shot multiple times in his torso, leading to abdominal injuries that required multiple surgeries to repair. Those surgeries were performed by Dr. Pathak Abhjit at Temple University Medical Center ("Temple") in Philadelphia, Pennsylvania.

On May 13, 2014, Moses was taken into federal custody and placed in the Federal Detention Center in Philadelphia, Pennsylvania ("FDC") to await prosecution on federal charges. While Moses was at FDC, he began to complain of a splinter-sized wire protruding from his healed abdominal surgical incision. At the time, medical personnel reported that the skin surrounding the protrusion was dry and intact, with no swelling, redness, or other signs of infection.

On May 12, 2015, upon his conviction for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), Moses was sentenced to 102 months of imprisonment. On May 26, 2015, he was transferred to FCI Cumberland to serve his sentence.

## I.     Moses's Account

According to Moses, immediately upon his arrival FCI Cumberland, he informed prison staff of his medical history.  Defendant Fazenbaker instructed Moses to email the prison medical service about his condition and also referred to him as "the guy who's been shot up a whole bunch of times."  Compl. ¶ 24.  On June 2, 2015, Moses contacted prison medical services personnel to complain of stomach pain and nausea and to alert them to the metal wire protruding from his abdomen.  Moses asked that an MRI be performed.  That same day, Moses was seen by Defendant Dr. Stephany McGann, who informed Moses that she was ordering an x-ray of Moses's abdomen.  Dr. McGann also informed Moses that she could give him only Tylenol for his pain because, based on his lab work, any other pain medications posed a danger of causing organ damage.  Moses then signed a release form to enable the prison to obtain his records from Temple.

According to Moses, although he was told that he would receive Tylenol, he received no pain medication.  Dissatisfied with the treatment he received, Moses filed an administrative grievance on July 17, 2015.  Over the ensuing month, Moses repeatedly emailed prison medical officials to complain about his "extreme pain and many symptoms" and also to ask that "medical personnel qualified to make an informed decision" be allowed to evaluate his condition.  Compl. ¶ 29.  On August 17, 2015, Moses noticed that the protrusion from his abdomen was "leaking clear fluid."  *Id.* ¶ 30.  On August 26, 2015, when Moses noticed that the area near the metal wire also had "infectious smells," Moses was seen by Dr. McGann and then by Defendant Dr. Mohamed Moubarek, the Clinical Director at FCI Cumberland, who declined to refer Moses out to a specialist for a CT scan because he believed such a procedure was not medically necessary.

*Id.* ¶ 31. Instead, Dr. Moubarek ordered that the protrusion be covered with a dressing. Based on this incident, Moses instructed his criminal defense attorney to contact Defendant Allison Foote, the Assistant Health Services Administrator for the prison, regarding the adequacy of his medical treatment. On August 27, 2015, Defendant Timothy Stewart, the Warden of FCI Cumberland, issued his response to Moses's grievance, indicating that the prison and its medical staff would "continue to investigate the proper treatment for the wire mesh" but denying Moses's request that he be seen by a specialist outside the prison. *Id.* ¶ 33. Moses appealed that determination and asked to be transferred to a medical facility.

Moses asserts that following his August 26, 2015 appointment, he continuously complained about pain, vomiting, and diarrhea and asked for prison staff to take pictures of his abdomen. Photographs were taken on September 15, 2015. On September 29, 2015, Moses asked Dr. Moubarek and Defendant Jamie Hamilton-Rumer, a Health Services Administrator for FCI Cumberland, for an updated plan of care. On September 30, 2015, while the dressing on his abdomen was being changed, Dr. Moubarek approached Moses and, in what Moses perceived to be an attempt to intimidate him, asked him why he had filed complaints against prison medical personnel and later told Moses to "take us to Court and we will win." Compl. ¶ 36. Moses asserts that Dr. Moubarek then ordered that his wound remained undressed, in retaliation for the grievance Moses had filed. Based on Dr. Moubarek's instruction, Defendant Hall, a duty nurse, refused to apply a dressing to Moses's abdomen despite Moses's request that she do so. As a result of this encounter, Moses filed another grievance and began documenting his interactions with prison medical staff and sending that information to Defendant Maria Arviza, the prison's Associate Warden, and to Warden Stewart.

Moses asserts that a series of retaliatory incidents followed. On October 4, 2015, he began vomiting blood while in the prison's recreation yard as a result of his gastroesophageal reflux disease ("GERD"). He was promptly seen by Defendant Boch, the duty nurse. Moses asked Boch to renew his prescription for 150 mg tablets of Zantac, but Boch informed him that the prescription had been discontinued and that if Moses wanted the medication, he would have to purchase the 75 mg dose available in the prison commissary. Moses further alleges that when, as a result of continued stomach distress, he did not arrive on time for his October 5, 2016 appointment with a prison doctor, the medical staff refused to see him. The next day, Hamilton-Rumer gave him a "bogus incident report" for an unexcused absence that led to sanctions against Moses. Compl. ¶ 39.

On October 13, 2015, Moses's appeal of the Warden's determination on Moses's July 17, 2015 grievance was denied, with the prison Regional Director finding that Moses was receiving adequate medical care. On October 20, 2015, Moses appealed that determination to the Bureau of Prison's Office of General Counsel. On October 29, 2015, Moses was then called in to meet with Defendant Hershenberger, a prison psychologist, who asked him about his complaint and joked that he "may have to harass" Moses, which Moses interpreted as retaliation for pursuing an appeal. Compl. ¶ 46. On November 17, 2015, Moses's appeal was denied, with the Office of General Counsel finding that he was receiving adequate medical treatment.

Meanwhile, on October 6, 2015, Dr. Moubarek spoke with Dr. Pathak, the surgeon who had operated on Moses in 2009. Dr. Pathak suggested that Dr. Moubarek order some form of imaging to rule out fistulas or other issues. On October 21, 2015, Moses was approved for a CT scan, which was then scheduled for November 9, 2015. On November 12, 2015, Dr. McGann

informed Moses that the results of the CT scan were "normal for someone in [Moses's] condition." Compl. ¶ 47. When Moses asked what could be done about the "extreme pain" and fluid discharge, she said that she would follow up with Dr. Moubarek. *Id.* ¶ 47.

By approximately November 18, Moses abdomen had a fleshy protrusion "sticking out of his stomach that looks like a tongue." Compl. ¶ 49. At the same time, "green slime" and a "foul stench" began to emanate from the area of the protrusion, prompting Defendant Swick, a duty nurse, to urge Dr. McGann to "'really' take a look at the wound." Mot. Prelim. Inj. ¶ 4, ECF No. 4. Dr. McGann, however, asked Swick what she was documenting about any leak and odor. When Swick showed her area of the protrusion, Dr. McGann stated, "I'm not putting it in my report" and simply instructed Swick to "just keep [the area] covered" with a bandage. *Id.*

On November 24, 2015, at Moses's daily dressing change, Dr. Moubarek, Foote, and Defendant Todd, a duty nurse, asked Moses to consent to having additional photographs taken of his abdomen to be sent to the Temple surgeons. Moses consented. Before taking the photographs, however, Dr. Moubarek used a Q-tip to push forcefully the protruding flesh back into Moses's abdomen, causing him extreme pain. Dr. Moubarek then allegedly passed the Q-tip to Foote, who did the same thing.

After this incident, Moses met with Fazenbaker and Defendant Muir, a Correctional Counselor, to discuss his treatment plan and possible transfer to another facility. Moses alleges that Fazenbaker and Muir told him that no such transfer was possible because there was a detainer preventing it. In a later conversation with another prison administrator, Moses allegedly learned that there was no such detainer preventing his transfer to another facility. Moses asserts that he remains in "physical and mental pain," that the area of the wire and skin protrusion "leaks

constantly and smells awful," and that he is concerned that if the standard of medical care he receives is not improved and he is not allowed to see an outside specialist, he "may need a small bowel transplant." Mot. Prelim. Inj. ¶¶ 6-7.

## II. Defendants' Account

In response to Moses's allegations, Defendants assert the following facts. On June 2, 2015, following Moses's arrival at FCI Cumberland, Dr. McGann found what "appear[ed] to be a suture" with a "sharp edge," but which was "very small" and therefore unable to be cut. Resp. Opp'n Mot. Prelim. Inj. ("Resp.") Ex. 6 at 3, ECF No. 18. Based on this examination, Dr. McGann ordered Moses's medical records from his surgery at Temple and scheduled him for an x-ray of his abdomen. There were no signs of infection near the suture or in the surgery site generally, nor was there any drainage observed. On July 16, 2015, Moses appeared again at sick call to complain about the protruding wire, which would snag his clothes. He also stated that there was a fleshy area, which was tender and at times drained clear fluid, which might protrude from his body. Dr. McGann observed no drainage. By that point, the prison had received Moses's medical records from Temple. After this visit, Dr. McGann left a message for Dr. Pathak, the doctor who had performed Moses's original surgeries, to discuss Moses's condition.

Beginning in August 2015, prison medical staff began to observe drainage from the area of the protrusion and instituted daily skin checks of Moses's abdomen. On August 26, 2015, Moses was examined by Dr. Moubarek, who found no infection or drainage at the surgery site and found also that neither the area near the wire nor the area near the small protrusion was tender to the touch. Moses was informed that the medical staff would continue to monitor his condition as part of the process of changing the dressing on his abdomen.

On September 29, 2015, Moses appeared for his daily dressing change and was seen by Hamilton-Rumer and Nurse Swick. He refused to have any dressing put on his abdomen because it pulled on his skin and would cause discomfort when removed. Resp. Ex. 11 at 1, ECF No. 23. Moses asserted that when he squeezed his lower abdomen there were "large amounts" of drainage, but medical staff saw no drainage from the site. *Id.* He also complained that he had not been transferred to a medical facility.

On October 6, 2015, Dr. Moubarek spoke with Dr. Pathak, informing him that Moses had a protruding piece of wire approximately 5 millimeters in length and a "small granuloma" that had "occasional scant serosanguineous discharge." Resp. Ex. 12 at 1, ECF No. 24. Dr. Pathak suggested either that the prison continue with its previous treatment plan or that it order a CT scan to rule out an abdominal fistula or pouch. On November 9, 2015, Moses was referred to an outside facility for a CT scan. The radiologist's report indicated that all of Moses's abdominal organs were normal, that there was no evidence of bowel obstruction, that there was no evidence of a fluid pocket, abscess, or fistula, and that while it was apparent that Moses had had multiple bowel surgeries, the condition of his abdomen and pelvis were otherwise "unremarkable." Resp. Ex. 13 at 1, 3, ECF No. 25. Dr. McGann reviewed these results with Moses on November 20, 2015. Based on these results, the prison medical staff planned to continue its prior treatment approach and would order a surgical consultation if Moses's condition worsened.

### III.    Post-Motion Allegations

In his Motions to Supplement his Complaint, filed between January 23, 2016 and June 6, 2016, Moses provides additional allegations. He asserts that on November 20, 2015, Dr. McGann referred Moses for a surgical consultation to evaluate Moses for possible treatment.

That referral, however, was never acted upon. Moses alleges that Defendant Hamilton-Rumer told him that Dr. McGann's request for a surgical consultation was pending before the prison Utilization Review Committee. On May 19, 2016, however, Dr. McGann informed Moses that Dr. Moubarek denied the request.

Moses also asserts that on January 20, 2016, Dr. Moubarek sought to take additional photographs of his abdomen, but that Moses refused permission because of the prior incident in which Dr. Moubarek had used a Q-tip to push the protrusion back into his abdomen, causing great pain. Moses claims that Dr. Moubarek acknowledged that the earlier photographs were never sent to the surgeons at Temple.

On February 19, 2016, Moses was moved to a county prison in Philadelphia pursuant to a writ of *habeas corpus* to provide testimony as a victim in a criminal matter. On March 4, 2016, a representative of Temple visited and informed him that Temple had received the photographs, but not the CT scan images. On March 16, 2016, a doctor at the county prison examined him, concluded that "no prison doctor is qualified to treat [his] condition or pain," and referred him to see surgeons at Temple on April 8, 2016. May 5, 2016 Mot. Supp. Compl. Ex. 3 at 12, ECF No. 40-3. Moses, however, was not sent to Temple because he was required to be at a state court proceeding that day and was returned to FCI Cumberland before it was rescheduled.

## DISCUSSION

I.     **Preliminary Injunction**

A.     **Legal Standard**

The purpose of a temporary restraining order ("TRO") or a preliminary injunction is to preserve the status quo "so that a court can render a meaningful decision after a trial on the

merits." *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991). A preliminary injunction is distinguished from a TRO only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n. 1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)). Here, the nonmoving party received notice of Moses's motion, so the Court treats his motion solely as one for a preliminary injunction.

To obtain a preliminary injunction, a moving party must establish (1) a likelihood of success on the merits, (2) likely irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the moving party's favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. To show such entitlement, the moving party must satisfy each of the four requirements. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009).

## B.    Likelihood of Success on the Merits

To meet the first requirement for a preliminary injunction, a moving party must "clearly demonstrate" that the party "will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth*, 575 F.3d at 346-47. Thus, to succeed on his Motion for a Preliminary Injunction, Moses must clearly demonstrate that he is likely to succeed on his claim that the medical care provided by Defendants, or lack thereof, has violated his constitutional rights.

10

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (internal quotation marks omitted). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal quotation marks omitted). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component, that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety, and a subjective component, that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that an official must have "knowledge" of a risk of harm, which must be "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* (citations omitted); *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when

11

prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference).  To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Here, it is undisputed that Moses has an objectively serious medical condition.  He suffered multiple gunshot wounds that required extensive surgery that has left him with a metal wire protruding slightly from his abdomen and which at times leaks a fluid discharge.  The issue is whether Defendants have subjectively known of and disregarded an excessive risk to his health.    *Jackson*, 775 F.3d at 178.  FCI Cumberland medical staff responded to Moses's complaints about the wire, protrusion of skin, and fluid discharge by covering the area, checking it on a daily basis, and changing the dressing.  They also consulted with Moses's surgeons at Temple and, at their suggestion, arranged for a CT scan, the results of which were normal.  Thus, as of December 28, 2015, the date that Moses filed his Motion for a Preliminary Injunction, FCI Cumberland medical staff had engaged in a regular course of examination, consultation, and management of Moses's condition.  Although Moses may disagree with the decision that he would not be sent to Temple or otherwise provided with a surgical consultation, a disagreement between an inmate and a physician over proper medical care is not sufficient to show deliberate indifference. *See id.*; *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985).

Moses, however, has alleged certain problematic facts that, if true, would establish more than a mere disagreement over medical treatment.  Moses asserts that in August 2015, Dr. McGann deliberately decided not to document in medical records the fluid discharge and foul

12

odor coming from the area of the wire and skin protrusion that she and a nurse specifically observed. Moses also alleges that in September 2015, Dr. Moubarek sought to intimidate him by questioning him on why he had filed an internal grievance against the prison medical staff, and several other Defendants also directly questioned him about, or commented on, his lawsuit when they were supposed to be providing medical care.   According to Moses, in November 2015, when taking photographs to be sent to the Temple surgeons, Dr. Moubarek used a cotton swab to forcefully push the skin protrusion back into Moses's abdomen, ostensibly to make the condition appear less serious in photographs. This procedure caused Moses significant pain. Although Defendants responded to Moses's motion on February 5, 2016 with affidavits and documentary evidence, they provided no evidence, testimonial or documentary, to refute directly these allegations.

Taken together, these troubling allegations, if true, would raise a concern that there may have been a deliberate effort to conceal Moses's condition, perhaps arising from hard feelings associated with Moses's filing of grievances against the medical staff. When combined with the lack of any medical solution to Moses's condition as of the filing of the Motion, these facts present, at a minimum, a colorable claim for deliberate indifference. However, because the course of treatment through the end of 2015, which included daily monitoring, consultation with the Temple surgeons, and a CT scan, was regular and meaningful, the Court cannot conclude that, for purposes of his Motion for a Preliminary Injunction, Moses has demonstrated a likelihood of success on the merits of his Eighth Amendment claim. *See Winter*, 555 U.S. at 20. Because Moses has failed to establish such a likelihood of success on the merits, there is no need to address the remaining *Winter* factors. *See Real Truth*, 575 F.3d at 347. Moses's Motion for a

13

Preliminary Injunction is therefore denied.

While Moses has not established, as of the filing of his Motion, that he is likely to succeed on his Eighth Amendment claims, he has stated a viable cause of action, so Defendants will be required to answer his Complaint as amended. *See infra* part II. However, Moses makes no allegations in the Complaint or any of his proposed supplements relating to Defendant Connor, so that Defendant will be dismissed from the case.

## II.     Motions to Supplement the Complaint

Moses has filed five Motions for Leave to Supplement the Complaint. ECF Nos. 11, 40, 41, 42 & 43. In addition to these motions, Moses has made two other filings, not captioned as Motions, supplementing his allegations. *See* ECF Nos. 13 & 32. The first, second, and fifth Motions for Leave to Supplement the Complaint, ECF Nos. 11, 40 & 43, expand on allegations made in the original Complaint. The third Motion for Leave to Supplement the Complaint, ECF No. 41, raises entirely new claims about the validity of his temporary transfer in February 2016 from FCI Cumberland to the state facility in Philadelphia. The fourth Motion for Leave to Supplement the Complaint, ECF No. 42, adds a claim that various staff at FCI Cumberland, including a "Mrs. Vorhees," failed to provide Moses with copies of his medical records, in violation of the Privacy Act, 5 U.S.C. § 552a (2012).

Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend] when justice so requires." Fed R. Civ. P. 15(a)(2). Here, the Court will grant Moses's first, second, fourth, and fifth amendments to the Complaint because they arise from the same core allegations he makes in his initial filing. However, the Court will deny the third Motion for Leave to Amend because its allegations relate to an entirely different series of events and parties, including a

Pennsylvania state prosecutor. Justice does not require that Moses be allowed to air any and all grievances he has as part of the same case. Moreover, it appears that this Court may lack jurisdiction over some or all of the claims, particularly those against the Pennsylvania prosecutor. Should Moses wish to pursue his claims about the validity of his transfer into state custody in February 2016, then, he must do so in a separate lawsuit.

Although the Court accepts four of Moses's supplements to his Complaint, Moses may not amend or supplement his Complaint in perpetuity. Moses therefore may not file any additional supplements or Motions to Supplement without first receiving express leave of Court. To obtain such leave, Moses must file a one-page letter indicating what new facts or issues he wishes to present and why he did not present them previously. Any filing Moses makes that does not comport with these guidelines will be stricken. Should Moses be appointed counsel, all of his filings should be made through his attorney.

## III.   Motions for Appointment of Counsel

On January 20, 2016, Moses filed a Motion for Appointment of Counsel. In that Motion, he asserts that he is unable to afford counsel, the issues in the case are complex and are comprised of medical issues that may require expert testimony, he has limited knowledge of the law, he has no "legal training," he is incarcerated by Defendants "who can easily limit [his] access to basic healthcare and legal materials," and his claims have legal merit. First Mot. Appointment Counsel at 1, ECF No. 7. A supplemental Motion for Appointment of Counsel, received on February 24, 2016, raises similar supporting arguments. ECF No. 34.

"The court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel." 28 U.S.C. § 1915(e)(1) (2012). In civil actions,

however, the Court appoints counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (internal quotation marks and citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008); *see also Altevogt v. Kirwan*, No. WDQ-11-1061, 2012 WL 135283, at *2 (D. Md. Jan. 13, 2012). Inherent in this analysis is that one's indigence is insufficient to establish exceptional circumstances.

Although the Court has denied the Motion for a Preliminary Injunction, there remain serious allegations of misconduct and complex medical questions to be addressed. Significantly, since the filing of the Motion for a Preliminary Injunction in December 2015, Moses has alleged additional troubling facts that strengthen his claim of deliberate indifference to his medical needs. Moses has since provided a medical record showing that in November 2015, when the skin protrusion became more prominent, Dr. McGann requested a surgical consultation. As late as May 2016, however, no such consultation had taken place, and Moses was told at different times either that the request was under review or had been denied by Dr. Moubarek. During this same time frame, Moses asserts, medical personnel at the county prison in Pennsylvania to which he was sent temporarily on a writ of *habeas corpus* referred him to Temple for such a consultation, but he was sent back to FCI Cumberland before it could occur. If it is true that a request from a physician at FCI Cumberland for a surgical consultation was left unresolved for

6-9 months, that FCI Cumberland has continued to refuse to send Moses for a surgical consultation even though other medical personnel at the Philadelphia facility had seen fit to schedule him to be examined at Temple in April 2016, and that Moses's pain and fluid discharge has continued without improvement or any treatment other than covering it with a bandage during the nine months since the filing of the Motion, Moses may now have a viable claim for his original request:  an injunction to require not a specific medical procedure, but a surgical consultation with qualified specialists to assess his medical needs and a commitment to pursue the specialists' recommendations. Moreover, if unresolved, the case will likely require discovery and retention of expert witnesses to address the complex medical issues involved in this case.

Because the Government has not yet addressed these later allegations, and it is unclear whether counsel is necessary going forward, the Court will deny the Motions for Appointment of Counsel without prejudice.   The Court will review the Government's Answer, due within 28 days, to assess whether any progress has been made in the intervening months to resolve Moses's medical needs.   In the absence of significant progress, including but not limited to the completion of the surgical consultation recommended in November 2015, Moses will likely need counsel to respond to Defendants' filings, consider whether additional motions should be filed, and, if necessary, engage in discovery and trial.   It is also clear from the record that if Moses's medical needs remain unmet, he will need counsel to engage FCI Cumberland to secure relevant records, such as the photographs taken of his condition, to advance his case.   Accordingly, Moses may renew his Motion for Appointment of Counsel following the filing of the Government's Answer.

**CONCLUSION**

For the reasons set forth above, Moses's Motion for a Preliminary Injunction is DENIED; his first, second, fourth, and fifth Motions for Leave to Supplement the Complaint are GRANTED; his third Motion for Leave to Supplement the Complaint is DENIED; and his Motions for Appointment of Counsel are DENIED WITHOUT PREJUDICE. Defendant Connor is DISMISSED. The remaining Defendants shall answer or otherwise respond to Moses's Complaint within 28 days. A separate Order shall issue.


Date:   September 9, 2016

THEODORE  D.  CHUANG
United States District Judge