# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| JOSHUA MOSES,<br>*Prisoner Identification No. 55716-066,*<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY STEWART, *Warden,*<br>S. MOHAMED MOUBAREK,<br>*Clinical Director,*<br>MARIA ARVIZA, *Associate Warden,*<br>STEPHANY MCGANN, *Physician,*<br>JAMIE HAMILTON-RUMER,<br>*Health Services Administrator,*<br>ALLISON FOOTE,<br>*Assistant Health Services Administrator,*<br>TODD, *Duty Nurse,*<br>HALL, *Duty Nurse,*<br>VARIMETER, *Duty Nurse,*<br>BOCH, *Duty Nurse,*<br>SWICK, *Duty Nurse,*<br>FAZENBAKER, *Case Manager,*<br>M. MUIR, *Correctional Counselor,*<br>HERSHENBERGER, *Psychologist,* and<br>MRS. VORHEES,<br><br>Defendants. | Civil Action No. TDC-15-3875 |

## MEMORANDUM OPINION

In 2009, Plaintiff Joshua Moses was shot multiple times in his torso, leaving him with abdominal injuries that required multiple surgeries to repair. In May 2015, Moses was convicted of a federal crime and was designated to serve his sentence at the Federal Correctional Institution in Cumberland, Maryland ("FCI-Cumberland"). Soon after his arrival at FCI-Cumberland, Moses began to ask the prison medical services for an outside surgical consultation for what he

contends are continuing complications from his surgeries, specifically a metal protrusion and fluid discharge from the surgical site. To date, no such consultation has been approved. On December 18, 2015, Moses filed suit in this Court pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), alleging that in not providing him a medically necessary surgical consultation, Defendants violated his right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment. With his Complaint, Moses filed a Motion for a Preliminary Injunction asking this Court to order that he be referred for a surgical consultation and be given a medical transfer. Moses later amended his Complaint several times to include new allegations of retaliation in response to his filing of this lawsuit, to add a claim for damages, and to add a claim under the Privacy Act, 5 U.S.C. § 552a (2012), against Defendant Vorhees.

The Court denied Moses's Motion for a Preliminary Injunction, concluding that based on the allegations he had made of events prior to the filing of that Motion, he was not likely to succeed on the merits of his claim. However, the Court noted that Moses's allegations, including those describing events occurring after the filing of his preliminary injunction motion, stated a plausible claim for relief. The Court thus ordered Defendants to file an Answer to Moses's Complaint. In response, Defendants have filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment. Moses, now represented by counsel, has opposed the Motion. The motion is ripe for disposition, and no hearing is necessary. *See* D. Md. Local R. 105.6 (2016). For the reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Much of the prior factual background of this case is set forth in the Court's September 9, 2016 Memorandum Opinion denying the Motion for a Preliminary Injunction. *Moses v. Stewart*,

No. TDC-15-3875, 2016 WL 4761929 at *1-5 (D. Md. Sept. 9, 2016). The Court therefore incorporates by reference that factual background, summarizes only those portions of that history most relevant to the pending Motion, and describes in detail only those new facts offered with the Motion that are necessary for its resolution.

## I.  Initial Allegations

As of August 2015, Moses had a piece of metal wire and a portion of flesh protruding from his abdomen at the site of his prior surgery. The protrusion was leaking clear fluid and had a bad odor, and Moses complained of abdominal pain, vomiting, and diarrhea. Although Moses requested a consultation with an outside specialist, Defendant Dr. Mohamed Moubarek, the FCI-Cumberland Clinical Director, did not detect any infection or tenderness and thus elected just to cover the area with a dressing. On October 6, 2015, Dr. Moubarek spoke with Dr. Abhijit Pathak, the surgeon who had operated on Moses in 2010 at Temple University Hospital ("Temple"). As a result of those discussions, Moses underwent a CT scan, which did not identify any abnormalities. As of November 18, 2015, however, Moses's abdomen had a fleshy protrusion "sticking out of his stomach that looks like a tongue." Compl. ¶ 49, ECF No. 1. At the same time, green slime and a foul odor began to emanate from the area of the protrusion, prompting Defendant Swick, a duty nurse, to urge Defendant Dr. Stephany McGann to examine the wound. Dr. McGann asked Swick what she was documenting about any leak and odor. When Swick showed her the area of the protrusion, Dr. McGann refused to include that information in her report and simply instructed Swick to cover the area with a bandage.

On November 24, 2015, at Moses's daily dressing change, Moses agreed to have photographs taken of his abdomen to be sent to surgeons at Temple. Before taking the photographs, however, Dr. Moubarek allegedly used a Q-tip to push forcefully the protruding

3

flesh back into Moses's abdomen, causing him extreme pain. Dr. Moubarek then allegedly passed the Q-tip to Foote, who did the same thing.

Moses also recounted a number of incidents during the fall of 2015 which he deemed retaliatory for filing complaints about the lack of a consultation with an outside specialist. In September 2015, Dr. Moubarek approached him, asked why he had filed complaints, and later told Moses to "take us to Court and we will win." Compl. ¶ 36. Moses asserts that Dr. Moubarek then ordered that his wound remained undressed, in retaliation for the grievance Moses had filed. On October 29, 2015, Moses was called in to meet with Defendant Hershberger, a prison psychologist, who asked him about one of his complaints and joked that he "may have to harass" Moses, which Moses interpreted as retaliation for pursuing an appeal. Compl. ¶ 46.

As of December 2015, Moses was in physical pain and reported that the area of the wire and skin protrusion leaked constantly and emitted an awful smell. He continued to seek a consultation with an outside specialist.

## II. Post-Motion Allegations

Following the filing of his Motion for a Preliminary Injunction, Moses submitted the following additional allegations between January 23, 2016 and June 6, 2016. He asserted that on November 20, 2015, Dr. McGann referred Moses for a surgical consultation to evaluate Moses for possible treatment. That referral, however, was never acted upon. Moses alleged that Defendant Hamilton-Rumer told him that Dr. McGann's request for a surgical consultation was pending before the prison Utilization Review Committee. On May 19, 2016, however, Dr. McGann informed Moses that Dr. Moubarek denied the request.

Moses also asserted that on January 20, 2016, Dr. Moubarek sought to take additional photographs of his abdomen, but that Moses refused permission because of the prior incident involving the Q-tip. Moses claims that Dr. Moubarek acknowledged that the earlier photographs were never sent to the surgeons at Temple.

On February 19, 2016, Moses was moved to a county prison in Philadelphia pursuant to a writ of *habeas corpus* to provide testimony as a victim in a criminal matter. On March 4, 2016, a representative of Temple visited and informed him that Temple had received the photographs, but not the CT scan images. On March 16, 2016, Dr. Mohammed Haque, a doctor at the county prison, examined him, concluded that "no prison doctor is qualified to treat [his] condition or pain," and referred him for a consultation at Temple on April 8, 2016. May 5, 2016 Mot. Supp. Compl. Ex. 3 at 12, ECF No. 40-3. Moses, however, was not sent to Temple because he was required to be at a state court proceeding that day and was returned to FCI-Cumberland before the consultation could be rescheduled.

### III. Additional Facts

With the pending Motion, Defendants have supplemented the record with (1) additional medical records beyond those submitted in response to the motion for a preliminary injunction; (2) a declaration from Dr. Moubarek; (3) the Federal Bureau of Prisons' Program Statement; and (4) a Declaration from Franceen Fletcher, a human resources specialist with the Bureau of Prisons.

The supplemental medical records show that from August 2015 to February 2016, from April to May 2016, and from July to August 2016, Moses received regular changes to the dressing on his abdominal wound, often multiple times in the same week. During those dressing changes, medical staff regularly observed a one-millimeter metal protrusion from Moses's

incision site and frequently noted a yellow or tan discharge from the wound. From August 2015 to February 2016, medical staff recorded their observations of Moses's incision site as part of the electronic record of the dressing changes. Beginning in April 2016, those notations ceased, and the medical records reflect only that a dressing change or skin check was done.

On February 11, 2016 and again on April 20, 2016, Moses's requests for a surgical consultation for his abdominal wound were denied on the basis that such treatment was not medically necessary. On May 25, 2016, Moses was seen by Dr. McGann after complaining of abdominal pain, diarrhea, and spitting up blood. Noting the two small wires protruding from his incision site, Dr. McGann provided Tylenol for the abdominal pain and requested a surgical consultation for Moses.

On June 20, 2016, Moses was seen by Dr. Moubarek, who observed the two pieces of wire at Moses's incision site but noted that one was completely covered by scar tissue while the other was partially covered with skin, and that there was no discharge or other sign of infection. Dr. Moubarek concluded that no additional intervention was necessary and declined to send Moses for a surgical consultation.

On September 8, 2016, Moses was again seen by Dr. McGann, after complaining of abdominal pain and a yellow discharge and redness at his incision site. Dr. McGann saw no drainage but observed a scab on the area from which the wire protruded. Dr. McGann advised Moses to take Tylenol for his condition. At a September 15, 2016 medical visit during which Moses again complained of abdominal pain, drainage from the surgical site, and diarrhea, a physician's assistant saw no signs of infection.

In his Declaration submitted with the Motion, Dr. Moubarek denies Moses's allegation that on November 24, 2015, immediately prior to Moses's wound being photographed, he used a

Q-tip to push parts of Moses's extruding flesh back into the wound, or to prod the wound so as to cause Moses pain. He asserts instead that he used the Q-tip only to point to parts of the wound. Dr. Moubarek also asserts, and provides email messages to substantiate, that contrary to Moses's allegation he provided those photographs to Moses's original surgeon. The photographs and the CT scan results were sent on February 1, 2016. Dr. Pathak did not respond to the submission or to follow-up messages left by Dr. Moubarek.

In her Declaration, Fletcher attests that Dr. McGann; Defendant Hamilton-Rumer; Defendant Allison Foote; Defendant VanMeter, incorrectly captioned as Defendant Varimeter; and Defendant Hershberger, incorrectly captioned as Defendant Hershenberger, are all employees of the United States Public Health Service ("PHS").

## DISCUSSION

Defendants move that this Court dismiss Moses's Complaint, or, in the alternative, grant summary judgment on several bases. First, they assert that Defendants McGann, Hamilton-Rumer, Foote, VanMeter, and Hershberger are immune to suit because they are employees of the PHS. Second, they assert that the remaining Defendants are entitled to qualified immunity. Third, they assert that Moses has failed to state a viable claim against the remaining Defendants.

### I. Legal Standard

In order to consider the exhibits submitted by Defendants in support of their Motion, the Court must construe the Motion as one seeking summary judgment. Fed. R. Civ. P. 12(d). Moses raises no objection to the Court considering those materials, and the submitted materials augment the medical records already before the Court on the Motion for a Preliminary Injunction. Under these circumstances, where there is no dispute between the parties on whether

7

the Court should consider materials attached to the Motion, the Court deems it is appropriate to convert the Motion to a motion for summary judgment.

Under Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49. In cases in which the factual record has not yet been fully developed through discovery, the Court may, in its discretion, deny a summary judgment motion. *Forest Hills Early Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 245 (4th Cir. 1984).

## II. Public Health Service Immunity

Defendants McGann, Hamilton-Rumer, Foote, VanMeter, and Hershberger assert that as employees of the PHS, they are immune to suit for a *Bivens* action. They are correct. Pursuant to 42 U.S.C. § 233(a), employees of the PHS are absolutely immune to suit "for actions arising out of the performance of medical or related functions within the scope of their employment." *Hui v. Castaneda*, 130 S. Ct. 1845, 1851 (2010). Here, the uncontradicted evidence establishes

that these Defendants are PHS employees, and Moses's allegations against them relate only to their performance of medical functions as PHS personnel. Defendants McGann, Hamilton-Rumer, Foote, VanMeter, and Hershberger will thus be dismissed from this action.

### III. Qualified Immunity

The remaining Defendants assert that they have qualified immunity to Moses's claim. Government officials sued in their individual capacities, as these Defendants are here, may invoke the protection of qualified immunity to bar a claim for civil damages under 42 U.S.C. § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity shields government officials from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Here, Moses claims that Defendants each participated, to differing degrees, in events that have led to the denial of medically necessary treatment in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See* U.S. Const. amend. VIII. The right of prison inmates to such treatment is a long-standing one of which Defendants should have been aware. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that a prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners"). Defendants are therefore not entitled to qualified immunity based on the nature of the right at issue. Qualified immunity would be available only if Defendants' conduct did not constitute a violation of that Eighth Amendment right, an issue discussed further below.

### IV. Eighth Amendment

As noted, a prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Id.*; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component, that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety, and a subjective component, that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that an official must have "knowledge" of a risk of harm, which must be "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* (citations omitted). To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

In its prior Memorandum Opinion, this Court found that Moses had an objectively serious medical condition and that, based on the totality of Moses's factual allegations, he had stated a viable claim that Defendants had been deliberately indifferent to that condition. Despite that

prior determination of the Court, Defendants now assert that Moses's claim cannot succeed, offering different theories for different Defendants.

### A. Warden Defendants

Defendants Warden Stewart and Associate Warden Arviza assert that they cannot be liable for Moses's deliberate indifference claim because, at most, their involvement in his treatment was limited to their handling of his prison grievances, not to any determinations about the nature or scope of his medical care. The evidence, even construed in the light most favorable to Moses, substantiates that argument. Warden Stewart's involvement in this matter was limited to denying Moses's prison grievance that he had not been referred to an outside specialist. Associate Warden Arviza's involvement appears to be only that Moses regularly forwarded to her copies of his written interactions with medical staff.

Non-medical prison staff, such as correctional officials, can violate the Eighth Amendment if they intentionally delay an inmate's access to available treatment for a serious condition. *Estelle*, 429 U.S. at 104-05; *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 104 (4th Cir. 1995). Here, Moses makes no allegation, and there is no evidence to suggest, that either Warden Stewart or Associate Warden Arviza intentionally delayed his treatment, only that they did not contradict the determinations about that treatment made by medical staff. However, prison non-medical staff are "entitled to rely" on the competence and expertise of prison health care providers. *See Miltier*, 896 F.2d at 854-55 ("No record evidence suggests why the wardens should not have been entitled to rely on their health care providers expertise."); *see also Paige v. Kupec*, No. AW-02-3430, 2003 WL 23274357 at *2 (D. Md. Mar. 31, 2003) (stating that prison non-medical staff are "permitted to rely on the professional judgment of health care providers employed to care for inmates"), *aff'd* 70 F. App'x 147 (4th Cir. 2003) (per curiam). The Motion

for Summary Judgment will therefore be granted as to Warden Stewart and Associate Warden Arviza.

B. **Defendants Fazenbaker, Muir, and Voorhees**

As to Defendants Fazenbaker and Muir, whom Moses identifies as a Case Manager and a Corrections Counselor, respectively, Moses's allegations are sparse. Moses asserts that when he first arrived at the prison, Fazenbaker referred to him as "the guy who's been shot up a whole bunch of times" and advised him to inform the prison medical services about his condition. Comp. ¶ 24. Then, after the November 2015 Q-tip incident, Moses met with Fazenbaker and Muir and asked for a transfer to another facility, only to be informed that a detainer was preventing any such transfer. Moses claims that there was no such detainer. Beyond these allegations, the evidence reveals no other tie between Fazenbaker and Muir and Moses's medical care.

These allegations are insufficient to support an Eighth Amendment claim. Because prisoners have no independent right to prevent or to secure a transfer from one prison to another, *Meachum v. Fano*, 427 U.S. 215, 225 (1976), any claim arising from the denial of a transfer could succeed only if there was evidence that a transfer was medically necessary and that the failure to approve such a transfer constituted deliberate indifference to a serious medical need. Here, Moses has offered no evidence that his medical needs could not be met while he resided at FCI-Cumberland, either onsite or by taking him offsite to facilities such as Temple. Indeed, the core of his claim is based on his allegation that a surgical consultation at Temple is medically necessary. Moreover, where there is no evidence that Fazenbaker and Muir were medical personnel, they would be entitled to defer to the prison medical staff's determination about the medical necessity of such a transfer. *Miltier*, 896 F.2d at 854-55; *Paige*, 2003 WL 23274357 at

12

*2. There is no evidence that any medical personnel recommended a transfer for medical reasons, or that Fazenbaker and Muir ignored such a recommendation. Accordingly, the motion will be granted as to Fazenbaker and Muir.

As for Defendant Voorhees, Moses's claim against her is under the Privacy Act, 5 U.S.C. § 552a. Where Defendants have made no argument addressing the Privacy Act, there is no basis to grant summary judgment at this time.

### C. Remaining Defendants

As for the remaining Defendants, all of whom have directly participated in Moses's medical care, they argue that Moses's allegations are insufficient to state a viable Eighth Amendment deliberate indifference claim, or alternatively, that they are entitled to summary judgment on this claim. In doing so, however, Defendants appear to overlook that this Court has already found that Moses stated a plausible Eighth Amendment deliberate indifference claim. *Moses*, 2016 WL 4761929 at *6. Although the Court denied the motion for a preliminary injunction based on the conclusion that Moses had not shown a likelihood of success on the merits, that standard need not be met for a plaintiff to state a plausible claim for relief under Federal Rule of Civil Procedure 12(b)(6). Moses's allegations identified an objectively serious medical condition, consisting of a metal wire and flesh protruding from his abdomen, fluid discharge that could not be permanently resolved, and apparently related chronic abdominal pain. Moses also alleged facts consistent with a finding of subjective knowledge of that condition and a deliberate failure to address it, specifically, his allegations that Dr. Moubarek purposely failed to allow the wound to be dressed in retaliation for complaining about the lack of a surgical consultation, that Dr. McGann at one point refused to document the fluid discharge, and that Dr. Moubarek deliberately sought to push the skin protrusion back into Moses's body in order for the

13

condition to appear less serious in pictures. Taken together, these facts sufficiently allege a claim that the decision not to permit a surgical consultation was not merely a disagreement over medical treatment, but a deliberate step to prevent Moses from receiving the consultation he had pursued by filing complaints.

Notably, the Court's ruling on the Motion for a Preliminary Injunction was based only on the facts presented as of December 2015, when the motion was filed. Since that time, Moses has supplemented his Complaint to add more facts, specifically, that Dr. McGann twice recommended a surgical consultation, both in November 2015 and in May 2016, but Dr. Moubarek declined to permit it. He also asserted that another physician, at a facility to which he was temporarily moved, recommended a surgical consultation at Temple University Hospital in April 2016, but that it never took place. Although a disagreement with other physicians over treatment decisions does not alone establish deliberate indifference, the fact that FCI-Cumberland did not act on three separate referrals for a surgical consultation from two different doctors gives additional circumstantial support for Moses's allegation that FCI-Cumberland denied a surgical consultation for retaliatory reasons. Accepting the allegations in the Complaint as true, as is required on a motion to dismiss, the Court previously concluded, and now reiterates, that Moses has stated a plausible deliberate indifference claim. Thus, if construed as a motion to dismiss, the Motion must be denied.

The new evidence offered in the form of exhibits to the Motion does not alter this conclusion or provide a basis to grant summary judgment. The additional medical records do not conclusively establish that Moses's condition has improved to the point that a surgical consultation is unnecessary. Rather, the records, which show that Moses's dressing was changed regularly from August 2015 through February 2016, and that there continued to be fluid

discharge, support the conclusion that Moses's condition did not improve or abate to any appreciable degree throughout that time period.

Then, after February 2016, the month in which Defendants submitted their memorandum in opposition to Moses's Motion for a Preliminary Injunction, medical staff ceased their previous practice of making observation notes about the condition of Moses's incision site even while they continued to change the dressing regularly until August 2016. Viewing those records in the light most favorable to Moses, the Court concludes, as it did in its Memorandum Opinion on the Motion for a Preliminary Injunction, that there is a viable "concern that there may have been a deliberate effort to conceal Moses's condition, perhaps arising from hard feelings associated with Moses's filing of grievances against the medical staff." *Moses*, 2016 WL 4761929 at *6. Indeed, the additional medical records confirm that in May 2016, Dr. McGann recommended a surgical consultation for the second time, that in September 2016, Moses again complained of fluid discharge and abdominal pain, and that Dr. McGann then observed that the area had developed a scab, more than year after the condition was first observed by medical staff. Because the additional records raise questions about the care afforded to Moses, rather than firmly establishing the quality of that care, they do not provide a basis to award summary judgment at this time.

As for Dr. Moubarek's statements in his Declaration that he denied a surgical consultation because no such consultation was medically necessary, that he in no way sought to intimidate or retaliate against Moses after learning of this lawsuit, and that he sent photographs to Dr. Pathak at Temple University Hospital, those assertions at most create a genuine issue of material fact. Contradicting his account are both Moses's accounts of retaliatory conduct and the recommendations of Dr. McGann and Dr. Haque that a surgical consultation was necessary.

Notably, Dr. Moubarek's evidence that he sent photographs of Moses's abdomen to Dr. Pathak actually demonstrates a lack of diligence in resolving Moses's condition. The photographs were taken on November 25, 2015, yet Dr. Moubarek did not send them until February 1, 2016, over two months later, and only when it came time for Defendants to respond to the Motion for a Preliminary Injunction. Remarkably, Dr. Pathak never responded, even to acknowledge receipt of the photographs, and since he sent them, Dr. Moubarek has never spoken to or communicated with Dr. Pathak about Moses's condition.

Thus, Dr. Moubarek's statements do not change the fact that Moses has continued to face the same serious medical condition for over a year, but the evidence in the record shows that there were no specific efforts taken between November 2015 and September 2016 to resolve it. Drawing all inferences in favor of Moses, as is required at this stage, the fact that dressings were required, and were changed regularly, up to August 2016 reflects that Moses's surgical site has not fully healed and that fluid discharge has continued throughout that time period. Thus, the medical staff appears to have known that Moses was continuing to live with a protruding wire and flesh, fluid discharge, and abdominal pain for up to a year, but was nevertheless content just to cover it up rather than take the simple step of having an outside surgeon examine Moses to assess whether something could be done to heal him. The apparent willingness to allow the condition to persist for a year without any meaningful treatment or consultation with outside experts creates, at a minimum, a genuine issue of material fact on the issue of deliberate indifference.

In its Memorandum Opinion on the Motion for a Preliminary Injunction, the Court stated that if "Moses's pain and fluid discharge has continued without improvement or any treatment other than covering it with a bandage during the nine months since the filing of the Motion,

Moses may now have a viable claim for his original request . . . a surgical consultation with qualified specialists to assess his medical needs and a commitment to pursue the specialists' recommendations." *Moses*, 2016 WL 4761929 at *7. That appears to be the case. Where the evidence available even before discovery suggests that FCI-Cumberland medical personnel have done nothing other than cover the area with a bandage and have taken no steps to find a permanent solution to Moses's condition such as securing an outside consultation, summary judgment is not warranted. Accordingly, the Motion will be denied. *See Andrew v. Clark*, 561 F.3d 261, 271 (4th Cir. 2009); *Forest Hills*, 728 F.2d at 245.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to Defendants McGann, Hamilton-Rumer, Foote, VanMeter, Hershberger, Stewart, Arviza, Fazenbaker, and Muir, all of whom are DISMISSED from this action. The Motion is DENIED as to all other Defendants. A separate Order shall issue.

Date: September 26, 2017

THEODORE D. CHUANG
United States District Judge